

form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1176 | **DATE** | 3/21/2002 |
| **CASE TITLE** | THE AMERICAN BAR ENDOWMENT vs. MUTUAL OF OMAHA INSURANCE CO. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Status hearing held. Enter Opinion And Order. Mutual has failed to prove its counterclaim against Endowment, and judgment is entered against Mutual and in favor of Endowment.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR 2 2 2002 date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| LG | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

THE AMERICAN BAR ENDOWMENT, )
)
) Case No. 00 C 1176
Plaintiff, )
) Hon. John W. Darrah
v. )
)
MUTUAL OF OMAHA INSURANCE )
COMPANY, )
)
Defendant. )
)
)

DOCKETED

MAR 2 2 2007

## OPINION AND ORDER

### BACKGROUND

The American Bar Endowment ("Endowment") is a nonprofit corporation incorporated under the laws of the state of Illinois, having its principal place of business at 750 North Lake Shore Drive, Chicago, Illinois. Mutual of Omaha Insurance Company ("Mutual") is a corporation incorporated under the laws of the state of Nebraska, having its principal place of business at Mutual of Omaha Plaza, Omaha, Nebraska. Mutual is licensed to do business in the state of Illinois and is engaged in the business of selling contracts of insurance nationwide.

There was a trial by the Court without a jury on the Endowment's complaint and Mutual's counterclaim and affirmative defenses of waiver and account stated. Testimony from several witnesses, including three expert witnesses, was heard over seven days.

For reasons discussed below, judgment is entered in favor of the Plaintiff and against the

Defendant.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all the admissible evidence as well as the Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

**I. Background.**

Between 1969 and 1994, the Endowment was the holder of certain group insurance policies issued by Mutual as part of the Group Insurance Program. The Long Term Disability ("LTD") polices were "experience rated" refund-eligible; that is, the insurance cost to the group was based on the group's claims experience. The Endowment would collect and pay a negotiated premium to Mutual. If the group's claims experience was favorable, then Mutual would pay the Endowment an experience refund, or dividend, payable by the Endowment to its members.

Effective May 1, 1986, Mutual issued to the Endowment a policy which provided group disability insurance coverage to participating members of the American Bar Association ("ABA"). That policy was a reissue of a policy, effective November 1, 1969, which provided group disability income insurance coverage to participating members of the ABA. Effective November 1, 1990, Mutual also issued to the Endowment a policy for additional group disability insurance for younger ABA members who chose to participate.

Mutual set aside a certain portion of premiums it received in connection with the Disability

Income Program as reserves against claims arising under those policies. Prior to 1991, the Endowment remitted only eighty percent of each premium and "held back" twenty percent in a contingency fund. In 1991, Endowment transferred $1.4 million to Mutual to establish a reserve for disability claims that had been incurred but not reported ("IBNR") and Mutual agreed to reduce the contingency fund to ten percent of premium and to pay future interest on the reserves it held based on a seven-year T-Bill rate.

After transfer of $1.4 million to Mutual, the Endowment continued to maintain a contingency reserve to provide Mutual with a limited form of security in the event of unfavorable claims experience. The Contingency Reserve Agreement dated November 1, 1992, provided that, after termination and a four-year run-off period, any excess reserves would be transferred to the Endowment.

The Contingency Reserve Agreement also provided, in the event of termination of the LTD policies, that: (1) Mutual would submit annual statements to the Endowment within ninety days of the date of termination and within ninety days of the termination date for the next four years, (2) such annual statements would set forth calculations of Mutual's terminal liability and any deficits under the terminated policies and designate the source of all figures used in the calculations, (3) the total liability of the Endowment for terminal reserve deficits would be limited to fifteen percent of the annual premium for the final policy year, (4) the Endowment would pay any terminal liability deficit by withdrawing funds from the contingency reserve, and (5) any funds remaining in the contingency reserve after making all payments owed to Mutual belonged to the Endowment as an experience credit.

Further, the Contingency Reserve Agreement identified "retention charge" as an expense to

be taken into account in calculating a deficit under the LTD policies. Retention charges consisted of (1) claim handling, (2) risk charges, (3) overhead and service, and (4) taxes. Before termination of the LTD policies, risk charges and overhead and service were calculated based on a percentage of the premium.

The LTD policies with these terms and conditions remained in effect until 1994 and resulted in annual experience refunds. The refund the Endowment received for the year ending November 1, 1993 was $1,031,318. The refund for the year ending November 1, 1994, the last year before termination, was $1,228,628.

The Endowment properly terminated the LTD policies, effective November 1, 1994. Mutual continued to be obligated to pay all remaining claims that had been incurred before termination and to maintain adequate reserves for unknown claims, claims that were incurred but not reported (IBNR). The Endowment continued to be obligated under the terms of the Contingency Reserve Agreement for terminal liability deficits.

On January 30, 1996, Mutual presented the Endowment with its preliminary Statement of Accounting for the 1994-1995 policy year, which was the first year after termination. Instead of a refund, Mutual claimed that there was now a deficit amounting to $51,635 for the Disability Income Program. Mutual informed the Endowment by means of its Statement of Accounting for the 1995-1996 policy year, the second year after termination of the Disability Income Program, that Mutual had calculated a deficit for the Disability Income Program in the amount of $173,205. For the 1996-1997 policy year, the third year after termination of the Disability Income Program, Mutual advised the Endowment in a Statement of Accounting that the deficit in the Disability Income Program amounted to $714,614.

The deficiency for each of these three years was because Mutual: (1) discontinued crediting Endowment with interest on reserves held by Mutual at the seven-year T-Bill rate; (2) changed the methodology by which reserves were calculated, which increased the size of the reserves and thereby decreased the amount of refund to Endowment, and (3) assessed new "retention" charges, which further diminished the refund to the point of deficit.

**II. Mutual's obligation after termination of the LTD policies during the post-termination or "run-off period".**

The transfer of $1.4 million to Mutual in 1991 and the Contingency Reserve Agreement in 1992 referred to above was accomplished by the following conduct of the parties. In March of 1991, Charles Lynch, Executive Director of Endowment, wrote to Mutual about the interest rate Mutual was crediting to the Disability Income Reserves. He inquired whether or not Mutual was willing to credit the Endowment with investment income on the reserves comparable to the industry average. There followed negotiations between Lynch and Russell Siders, Mutual's chief contact with Endowment. The Endowment indicated it would give up the entire escrow fund it then held in exchange for a reasonable rate of interest from Mutual on the reserves it held. In response to a suggestion from Lynch, Mutual prepared a letter, which was sent to the Endowment on May 24, 1991. In the letter, Siders made the following offer:

> (1) $1,415,752 be transferred to Mutual to establish the IBNR reserve to become part of the annual statement; (2) a contingency reserve of ten percent of the annual premium will be maintained within the contingency deposit agreement; (3) future interest credits on reserve will be based on seven-year U.S. Treasury Bonds with a phase-in approach as previously outlined.

Mutual attached an exhibit to the letter, calculations reflecting Mutual's intended handling of future interest credits on reserves, starting with the November 1990 through 1991 policy year. The new

interest credit method would apply to the new $1,400,000 IBNR reserve, which was to be transferred to Mutual, as well as all other reserves held by Mutual for the LTD Program. The calculations on the exhibit to the May 24, 1991 letter covered the year ending November 1, 1997, and Mutual promised to credit interest at the seven-year T-Bill rate on the entirety of the reserves for that year. Mutual also told Endowment that the annual increase in reserves would be, likewise, credited at the seven-year T-Bill rate for the next seven years through 1998. At the June 15, 1991 meeting, the Board of Directors of Endowment accepted Mutual's offer and authorized the transfer of the escrow account, credit at the higher interest rate, and the maintenance of a contingency reserve of ten percent of the annual premium. The Endowment wire-transferred $1,415,752 to Mutual on August 30, 1991. In performance of the agreement set out in the May 24, 1991 proposal, Mutual began paying interest credits under those terms. A new Contingency Reserve Agreement was prepared pursuant to the terms of the agreement. That contingency reserve was ultimately increased from ten percent of premium to fifteen percent of premium, effective November 1, 1992. In all of the communications and negotiations leading up to the formation of the agreement as set out in the May 24, 1991 letter, no one placed any conditions or limitations on the commitment to provide "a future interest on credits" in accordance with the seven-year T-Bill method as set out in that letter.

The parties repeatedly acknowledged the 1991 agreement and, in fact, modified the agreement in 1993. At no time during this period did the parties discuss what "future years" meant nor were any conditions or limitations placed on the commitment of Mutual to provide "future interest credits" on the cashflow.

On July 8, 1994, Mutual advised Endowment that all interest credits previously paid on the reserves in 1991, 1992, and 1993 would be terminated on contract termination, effective

November 1, 1994. The decision to terminate interest credits on contract termination had been made by Richard Flanagan, a Mutual Vice President and Director in the LTD division. Before he decided to terminate interest credits, he did not ask Russell Siders if there was any agreement between the parties in place that would prevent discontinuing interest credits nor did he make any search for any documents bearing on the obligations of the parties, including the May 24, 1991 agreement.

**III. The method of calculating the reserves.**

In 1994, Flanagan decided to change the reserve basis after he received notice of cancellation from Endowment. Flanagan changed the reserve tables and discount rate to a more conservative level. He did so even though he was not familiar with the exact discount rate or formula Mutual used at the time in estimating reserves. There was nothing in the fact of cancellation of the LTD policies that increased the risk to Mutual. No one from Mutual disclosed to Endowment that Mutual had changed the discount rate or reserve table. To the contrary, Mutual had surreptitiously changed the method by which reserves were calculated. Mutual also attempted to mislead the Endowment about reserve calculations by claiming that certain procedures were required by statute when in fact the statutory and regulatory reserve requirements were imposed on the carrier by state regulations and in no way controlled the contract provisions between the carrier, Mutual, and the policy holder, Endowment.

**IV. Post-termination retention charges.**

Since the beginning of the parties' LTD policy relationship, Mutual had quoted retention charges as a percentage of premium. This course of dealing between Mutual and Endowment provided for specific claim-related charges, a $10 charge per check issued to a claimant and $250 new claimant set-up fee. The post-termination retention charge to the Endowment of $130,000

included a $50,000 "risk charge" and $80,000 in administration and overhead. However, Mutual did not provide a breakdown of the $80,000 administration fee or any component thereof dealing with employees' time. Other than the Endowment, none of Mutual's other insureds in a cancelled policy situation had been assessed a risk charge.

Previously, there had been no separate risk charge during the entire period the policy was in effect. Mutual did not disclose the change in retention charges nor the basis for its calculation, resulting in the $50,000 risk charge to Endowment.

## V. Endowment's request of Mutual to transfer the reserves.

On December 15, 1994, Endowment formally requested Mutual transfer its Disability Reserves to U.S. Life, which had a (industry) Best's Rating of A+ (superior) for that year and was generally believed to be a financially strong company and very reputable. On January 26, 1995, Russell Siders wrote to Endowment declining to transfer the reserves and stated, "Even if we were to consider attempting to transfer this liability to another party, it is doubtful that either Nebraska or Illinois Insurance Departments would sanction such an arrangement". The transfer of these reserves could have, in fact, been accomplished either through reinsurance or coinsurance, and Nebraska and Illinois Insurance Departments would have permitted the reserve transfer.

## VI. Industry custom and practice.

Endowment presented two expert witnesses, both highly competent with many years of experience in refund-eligible group long-term disability insurance. Both experts testified as to the custom and practice in that sector of the insurance industry. It is the custom and practice in that industry to determine interest credits on reserves at the same rate of interest both before and after termination of the policies. It is not industry custom and practice to change the reserve basis, as

Mutual did in this case, after termination. It is the custom and practice in that industry that the retention formula remain the same pre- and post-termination; and because the premium is zero after termination, a post-retention charge based on premium, as in the instant case, is also zero. It is contrary to, and inconsistent with, custom and practice in that industry for Mutual to impose the post-termination administrative risk costs that it applied during the run-off period of the Endowment LTD policies. It is custom and practice in that industry to determine interest credits on reserves at the same rate of interest both before and after termination. Likewise, it is not industry custom and practice to change the reserve basis as Mutual did. Mutual presented an expert who testified to the contrary, but the expert had no specific experience with the relevant product, refund-eligible long-term disability insurance.

Also, both Endowment's experts testified regarding the May 24, 1991 letter. The letter regarding interest payments at seven-year T-Bill rates was a means of setting out an agreement consistent with industry custom and practice and that it is not customary for carriers and policy holder associations to write into the master insurance policy any provisions dealing with interest credits.

## VII. Mutual's affirmative defenses of waiver and account stated.

Renee Leskiw succeeded Charles Lynch in 1994 as Endowment Executive Director. Lynch, who negotiated the agreement defined in the May 24, 1991 letter for the Endowment, was diagnosed as suffering from Parkinson's disease in 1994. He also learned his son had terminal cancer at that time. Lynch was out of the office much of the time before his resignation. About three months before he left, Renee Leskiw was hired as his successor. Mr. Lynch was distracted when Ms. Leskiw questioned him regarding insurance and suggested she contact Mutual and get answers. On

June 28, 1994, a few weeks after she joined the Endowment, Ms. Leskiw contacted Mr. Siders of Mutual, who had dealt with Charles Lynch and who authored the May 24, 1991 letter. She inquired what interest rate was credited to reserves for the years 1991 through 1994 and if Mutual would pay interest on the reserves if the LTD insurance contracts were terminated. At the time she wrote the June 28, 1991 letter, Ms. Leskiw did not know of the May 24, 1991 letter agreement, and neither Mr. Siders nor anyone else at Mutual informed her of its existence. Rather, Mr. Siders responded to Ms. Leskiw with a memo which stated that all interest would terminate on contract termination. As set out above, this decision to so terminate interest payments was actually made by Rick Flanagan, Mutual Vice President and Products Manager. It is noteworthy that, later, Mr. Siders prepared a memo to file that said, in pertinent part, "My real concern is that [Endowment] will make a legal question out of our termination of any future interest on a terminated [policy] . . . ."

When the large deficit of $714,614 was reported for the 1996-1997 policy year, Renee Leskiw retained Charles Sherfey, an actuary, to review the practices of Mutual. It was only when Sherfey completed his review that Ms. Leskiw and that the Endowment concluded that the post-termination accounting practices by Mutual regarding determination of reserve amounts and retention charges were designed to unlawfully confiscate the reserve fund. Ms. Leskiw immediately notified Endowment's Board of Directors. The Endowment Board sent Mutual a demand letter regarding data and methodology on September 21, 1998.

**VIII. Damages.**

Endowment's expert, Ms. Niehus, calculated Endowment's loss based on Mutual's misconduct following termination of the LTD policies. Mutual's conduct following termination of the LTD contracts caused loss to Endowment in three ways: (1) Mutual did not credit the reserves

-10-

at the seven-year T-Bill rate after termination. The unpaid interest credits paid at this rate is $997,390; (2) the excess reserves due and owing Endowment under the Contingency Reserve Agreement is $439,344 if Mutual had not changed its reserve practices after notice of cancellation; and (3) the change in post-termination retention charges from the previous rate of a percentage of premium totaled $322,300.

The total of the unpaid interest credits, excess reserves, post-termination retention charges, and the reduction in the reported balance is $1,759,034. The Illinois statutory rate on prejudgment interest is five percent. Portions of Endowment's damages first became due on the 30th of January in 1996 ($511,991), 1997 ($381,956), 1999 ($944,750), and on the 12th of January in 1998 ($336,416). There was also evidence presented as to the computation of prejudgment interest on these amounts. Prejudgment interest was calculated as simple interest from the date the money was owed until September 17, 2001, assuming a thirty-day month and a 360-day year. Therefore, Endowment is entitled to $342,174 in prejudgment interest.

## CONCLUSIONS OF LAW

The parties agree that Illinois law controls. Whether a contract exists is a question of law. A written contract may consist of "various forms such as notes, papers, letters and telegrams, so long as, taken together, they contain on their face, or by reference to other writings, the names of the parties, an identification of the subject matter of the contract, and the terms and conditions of the contract." *Am. Coll. of Surgeons v. Lumbermen's Mut. Casualty Co.*, 142 Ill. App. 3d 680, 698-99 (1986).

Where a term in an agreement is undefined, and in the absence of an integration clause, it may properly be defined by the custom and practice in the industry, the course of dealing between

-11-

the parties, and the implied covenant of good faith and fair dealing. *See, e.g., Preferred Internal Sys. v. Central Home, Inc.*, 277 Ill. App. 3d 414, 420-21 (1995). "[T]he doctrine of good faith performance imposes a limitation on the exercise of discretion vested in one of the parties to a contract . . . [such that] the party vested with contractual discretion must exercise that discretion reasonably and with proper motive and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties . . . ." *Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 990-91 (1984).

"'[W]here a contract does not specify a time for performance of an obligation, a "reasonable time" is implied.'" *Am. Bar Endowment v. Mut. of Omaha Ins. Co.*, No. 00 C 1176, 2001 WL 987892, at *3 (N.D. Ill. Aug. 24, 2001) (quoting *Nelson v. Sotheby's, Inc.*, 128 F. Supp. 2d. 1172, 1175 (N.D. Ill. 2001) (citation omitted)).

The parties entered into a valid contract pursuant to the terms and conditions of the letter to Endowment from Mutual of May 24, 1991, which constituted an offer which was accepted by Endowment Board of Directors' action and subsequent transfer of $1,415,752 from Endowment to Mutual on August 30, 1991. The terms and conditions of the contract are further manifested and defined by the correspondence exchanged between Mutual and Endowment from March 1991 to August 1, 1991. The agreement was further supplemented and amended as provided in additional correspondence in May of 1993. The agreement required Mutual to provide interest credit on the sums it maintained as reserves for disability income claims based on the yield of seven-year U.S. Treasury Bonds throughout the run-off period after termination.

Mutual breached the obligations imposed by this agreement to Endowment after termination of the disability income policies by failing to credit interest in accordance with this method as was

required by the agreement.

Mutual had an obligation to calculate annual experience credits under the Contingency Reserve Agreement and failed to perform its obligation to refund excess reserves to the Endowment at the end of the run-off period after termination of the disability income policies. The term "reserve" appears in the Contingency Reserve Agreement without definition; its meaning is properly derived from the course of dealing between the parties. In this regard, the parties had agreed to a particular reserve table at the onset of their relationship and collaborated on changes thereafter. Mutual's discretion to calculate these reserves was limited by the agreement of the parties as defined by this course of dealing. Mutual's obligation to calculate reserves required it to use the same methodology both before and after termination of the long-term disability policies. Mutual breached its obligation to the Endowment in this regard. It failed: to refund annual experience credits properly and to remit excess reserves to the Endowment at the completion of the run-off period.

Mutual owed a contractual obligation to Endowment to assess retention charges as imposed by the Contingency Reserve Agreement. Retention had been agreed upon between the parties to be a percentage of premium. Therefore, after termination of the policy, retention should have become a zero charge for the years from 1994 through 1998. Mutual had an obligation to calculate retention by the same methodology both before and after termination. Mutual breached its contractual obligations to Endowment in this regard by failing to follow the same retention formula it followed before termination and by assessing unreasonable retention charges that were not contemplated by the parties pursuant to the agreement. The conduct of Mutual in this regard was arbitrary, capricious and not a good faith performance of its contractual obligations.

Mutual further breached its obligations to Endowment pursuant to paragraph 7 of the

Contingency Reserve Agreement, which required Mutual to provide, within ninety days after the November 1st termination date and each of four years after termination, an annual statement that "set forth the calculations substantiating Mutual's terminal liability and any deficit and designating the source of all figures used in the calculations. Mutual of Omaha failed to provide Endowment the source of figures used in the calculations of interest credits and retention charges and failed to disclose Mutual's change in the method of computation of the reserve basis. Mutual actively concealed these charges and acted other than in good faith.

Evidence of custom and usage in an industry is admissible to supplement the terms of a contract where there is no provision in the contract regarding the subject to the contrary. *Rush Presbyterian St. Luke's Med. Ctr. v. Safeco Ins. Co. of Am.*, 722 F. Supp. 485, 495 (N.D. Ill. 1989). However, evidence of a custom and usage in an industry cannot be used to contradict a contrary express contractual provision. *Rush Presbyterian*, 722 F. Supp. at 495. The existence of a custom or usage is a question of fact. *Nelson*, 128 F. Supp. 2d at 1176 (citing *Allen Saltzman Assocs., Inc. v. Aileen, Inc.*, 633 F. Supp. 1161, 1163 (N.D. Ill. 1986)).

A custom or usage is binding if it is "so well known, uniform, long-established and generally acquiesced in as to induce a belief that the parties contracted with reference to it, nothing appearing in their contract to the contrary." *Dahly Tool Co. v. Vermont Tap & Die Co.*, 742 F.2d 311, 314 (7th Cir. 1984) (citing *Katz v. Brooks*, 65 Ill. App. 155, 160 (1965)). When a company engages in commerce in a particular industry, it is presumed that it deals in accordance with general and uniform customs and usages in that market. *Clark v. Gen. Foods Corp.*, 81 Ill. App. 3d 74, 78-79 (1980).

"Evidence of an industry custom should . . . be presented by several witnesses so as to establish the general knowledge and acceptance of the purported custom or usage within a particular

industry in a particular location at a particular time." *Nat'l Diamond Syndicate, Inc. v. United Parcel Servs., Inc.*, 897 F.2d 253, 260 (7th Cir. 1990) (citations omitted). Where experts have first-hand knowledge of a custom and usage, it is not necessary to show that they have witnessed its use in factual circumstances identical to those of the case in which he testifies. *Clark*, 81 Ill. App. 3d at 80. It need not be shown that a custom was followed in every case by every insurance company in order to establish an industry custom. *See Capital Dev. Bd. v. G.A. Rafel & Co.*, 143 Ill. App. 3d 553, 559 (1986).

Therefore, even if there was no contract expressed between the parties regarding Mutual's post-termination conduct, Mutual violated the established customs and practices in the long-term disability insurance industry. The Endowment properly established that industry custom and practice regarding the relevant insurance product required Mutual to use the same interest crediting methods, retention formula, and reserve basis determination after termination of the LTD policies as before. Where experts like Bogardus and Niehus have first-hand knowledge of custom and usage, it is not necessary to show that he or she witnessed its use in factual circumstances identical to those in the case in which the expert testifies. *Clark*, 81 Ill.App.3d at 80. The Endowment need not show that a custom was followed in every case by every insurance company in order to establish an industry custom. *Capital Dev. Bd.*, 143 Ill. App. 3d at 559. Further, it is not necessary to prove Mutual's actual knowledge of custom and usage in this regard because it is a company engaging in commerce in the long-term disability industry and is presumed that it deals in accordance with general and uniform custom and usage in that market. *Clark*, 81 Ill.App.3d at 78-79. That Mutual took care to conceal and obfuscate its actions, as mentioned above, strongly suggests that it knew full well that its actions were impermissible.

Mutual claims Endowment waived its rights by failing to immediately object to the post-termination procedures. Regarding the issue of waiver, waiver is "the intentional relinquishment of a known right." *Cole Taylor Bank v. Truck Ins. Exch.*, 51 F.3d 736, 739 (7th Cir. 1995). The party claiming a waiver of rights bears the "burden of proving a clear, unequivocal, and decisive act of its opponent manifesting an intention to waive its rights." *In re Nitz*, 317 Ill. App. 3d 119, 130 (2000).

The conduct of Renee Leskiw, as a successor Executive Director to Charles Lynch for Endowment, did not constitute a waiver by Endowment of its rights to Mutual's performance of its obligations during the run-off period after termination of the LTD contract. During the time prior to her demand that Mutual perform its obligations, Renee Leskiw was clearly not knowledgeable of the May 24, 1991 agreement nor its terms and conditions. Mutual, through the actions of Russell Siders, who negotiated the agreement with Renee Leskiw's predecessor, Charles Lynch, never told her of its existence and specifically advised her that interest on the reserves would end upon termination of the policy. Endowment objected in a prompt and timely fashion after the actuary it retained disclosed the nature of Mutual's post-termination procedures. Endowment did not knowingly and intentionally waive its rights pursuant to the agreement between the parties.

Mutual has asserted the defense of an account stated. The doctrine of account stated prohibits a party from contesting a written statement of account when "a statement of account has been rendered by one party to another and is retained by the latter beyond a reasonable time without objection, thereby constituting an acknowledgment and recognition of the correctness of the account." *Chicago Ill. R.R. Co. v. Martin Bros. Container & Timber Prods. Corp.*, 87 Ill. App. 3d 327, 330 (1980) (citing *Motive Parts Co. of Am. v. Robinson*, 53 Ill. App. 3d 935 (1977)). "Assent to an account stated may be shown by payment or part payment of the balance" shown in the written

statement. *In re Marriage of Angiuli*, 134 Ill. App. 3d 417, 422 (1985).

Endowment's conduct cannot be construed as an acknowledgment of the correctness of the post-termination statements it received from Mutual. As stated above, Mutual's conduct was one of concealment and subterfuge regarding the methodology in determining the amounts contained in the statements despite the repeated demands by Endowment for the disclosure required pursuant to the Contingency Reserve Agreement.

Endowment has pled a claim for unjust enrichment. A claim for unjust enrichment "is based on an implied contract." *AA Sales & Assoc., Inc. v. JT&T Prods. Corp.*, 48 F. Supp. 2d 805, 807 (N.D. Ill. 1999). Under Illinois law, "[a] claim for unjust enrichment exists when a defendant (1) receives a benefit, (2) to the plaintiff's detriment, and (3) defendant's retention of that benefit would be unjust." *TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.*, 131 Ill. 2d 145, 160 (1989)). The doctrine of unjust enrichment does not apply in this case where an actual contract governs the relationship between Endowment and Mutual. *AA Sales*, 48 F. Supp. 2d at 807.

Regarding Endowment's claim for damages, the plaintiff in a breach of contract action is entitled to recover damages in an amount that will put it in as favorable a position as it would have occupied had the defendant performed its contractual obligations. *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 278 (7th Cir.), *cert. denied*, 519 U.S. 928 (1996).

Endowment has suffered damages in the amount of $1,759,034 as a result of Mutual's breaches of its contractual obligations during the four years after termination of the LTD policies. Damages include the amount of (1) the improperly reduced interest credits, (2) the inappropriate and unreasonable retention charges, and (3) excessive claims reserves. Endowment has established its

right to receive damages in the amount of $1,759,034 calculated before the award of prejudgment interest.

Prejudgment interest "is generally recoverable only when an express agreement between the parties exists or if it is authorized by statute." *Movitz v. First Nat'l Bank of Chicago*, 982 F. Supp. 566, 568 (N.D. Ill. 1997). Illinois law allows prejudgment interest at a rate of five percent per annum "for all moneys after they become due on any . . . instrument of writing." 815 Ill. Comp. Stat. 205/2 (2002). "To recover prejudgment interest under [section 205/2], there must be a fixed and easily calculated amount due from a debtor-creditor relationship that has come into existence by virtue of a written instrument." *Moody v. First Nat'l Bank of Moline*, 239 Ill. App. 3d 986, 990 (1993). "[T]he sum due must be liquidated or subject to easy determination by calculation or computation." *Couch v. State Farm Ins. Co.*, 279 Ill. App. 3d 1050, 1054 (1996) (citations omitted). Prejudgment interest is available even when the claimed right and the amount due require legal ascertainment, if the amount can be determined. *New Hampshire Ins. Co v. Hanover Ins. Co.*, 296 Ill. App. 3d 701, 709 (1998) (citation omitted).

The May 24, 1991 letter, related correspondence, and the Contingency Reserve Agreement constitute "instruments of writing" for purposes of 85 Ill. Comp. Stat. 205/2. Each of the obligations owed by Mutual to Endowment as a result of Mutual's breach concerning interest credits, retention charges, and claims reserves is based on a written undertaking of Mutual. Each obligation is readily capable of calculation. The Endowment is, therefore, entitled to prejudgment interest at the rate of five percent per annum on the amount due.

Mutual has failed to prove its counterclaim against Endowment, and judgment is entered against Mutual and in favor of Endowment thereon.

_____
John W. Darrah, Judge
United States District Court

Date: March 2, 2002

-19-